Hazel D. **WOODARD** and Robert T. Mills, Plaintiffs,

v.

John E. **LEHMAN, Jr.**, Secretary of the Navy, Defendant.

Civ. A. No. 76–1100–1.

United States District Court, D. South Carolina, Charleston Division.

Jan. 13, 1982.

---

Steven J. Metalitz and Armand Derfner, Charleston, S. C., and Stephen L. Spitz and Richard T. Seymour, Lawyer's Committee for Civil Rights Under Law, Washington, D. C., for plaintiffs.

Heidi M. Solomon, Asst. U. S. Atty., Charleston, S. C., and Alex H. Adkins, Civil Personnel Law Division, Norfolk, Va., for defendant.

## ORDER

HAWKINS, District Judge.

This case was heard by this court on September 14 through September 15, 1981. The plaintiffs' complaint alleges violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Equal Employment Opportunity Act of 1972, and of the Fifth Amendment and Executive Order No. 11478, 34 Fed.Reg.

12985. The plaintiffs are both black citizens of the United States employed at the Southern Division, Naval Facilities Engineering Command, Charleston, South Carolina (hereinafter referred to as SOUTHDIV).

SOUTHDIV is an agency of the United States Navy whose primary mission is to accomplish the planning, design and construction of public works and other facilities for Navy use in a twelve-state region. The agency has its headquarters staff in Charleston, South Carolina, and maintains numerous field offices throughout the South. This case is only concerned with the employment practices of the agency at its headquarters office. During the period covered by this litigation, the proportion of blacks in the work force was consistently less than that of comparable local Navy activities, and less than the Charleston area labor force as a whole.

Having heard the testimony, studied the exhibits, and having fully reviewed all the evidence, the court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. The plaintiffs, Hazel D. Woodard and Robert T. Mills, are two black employees in the Office of the Comptroller, SOUTHDIV.

2. On March 4, 1976, plaintiffs filed substantially identical informal complaints of class wide discrimination with a SOUTHDIV EEO counselor. In their administrative complaint, the plaintiffs alleged that:

a. They were repeatedly denied promotions and were unable to advance beyond the GS–4 level;

b. They were denied training opportunities leading to promotion; and

c. They were given unfavorable supervisory appraisals based upon subjective and discriminatory criteria preventing their advancement.

The most recent incident of alleged discrimination cited by either plaintiff was a denial of training opportunities. That incident oc-

curred within thirty days of their first contact with the EEO counselor.

3. After a review of the plaintiffs' administrative complaints and the report of the EEO counselor, the SOUTHDIV Commanding Officer requested the plaintiffs to provide written statements with specific illustrations of the alleged discrimination and a specific statement of the corrective action required. In lieu of providing a more specific statement about their allegations, plaintiffs responded that the complaints presented to the EEO counselor were sufficient as the charge was one of systematic and continuing discrimination. The SOUTHDIV Commanding Officer cancelled plaintiffs' administrative complaints on May 9, 1976, for a failure to prosecute[1] in that no information had been provided as to "specific incident(s), date(s), or personnel involved which would be within the scope and timeliness provisions...." of the Civil Service Commission's regulations.[2] The letters cancelling plaintiffs' complaints informed them that they had the right to appeal to the Civil Service Commission or file a lawsuit seeking judicial review in the appropriate United States District Court.

4. The plaintiffs initiated the present lawsuit in the United States District Court for the District of South Carolina within thirty days after their receipt of the final decision by the SOUTHDIV Commanding Officer.[3]

### SOUTHDIV Promotion Practices

5. A merit promotion system is used at SOUTHDIV. It is administered by the Consolidated Civilian Personnel Office (CCPO) at the Naval Supply Center, Charleston, South Carolina.

6. Applicants for SOUTHDIV's merit promotions are recruited in one of two ways. Where a particular job is unique or is filled infrequently, it is advertised as a single vacancy. And where there are frequent vacancies, an "open continuous" promotion register is advertised. In the first instance, applicants receive a onetime consideration for a specific vacancy. In the second instance, an applicant may be referred to many activities served by the CCPO that are recruiting employees with the applicant's qualifications. The application remains on the register for a one year period.

7. An employee may apply for promotion by submitting a Personal Qualifications Statement (SF–171) to the CCPO. The SF–171 is subsequently examined to determine whether the applicant satisfied basic requirements for the vacant position on the register; e.g., an accountant would not be promoted to an engineer under the merit promotion system. After basic requirements have been examined, applications receive a numerical rating that indicates how well their previous employment history relates to qualifications for the vacant job on the register.

8. The applicant's immediate supervisor is asked to complete an appraisal that rates the applicant's performance in specific elements of the vacant job or of the positions filled through the register. At the time plaintiffs filed their administrative complaint, the supervisory appraisal and the rating based upon the SF–171 were given equal weight in arriving at the final score. Subsequently, the weight given to the supervisory appraisal was reduced to twenty-

---

1. 5 C.F.R. 713.215, now codified at 29 C.F.R. 1613.215, provides for rejection or cancellation of administrative complaints by the agency.

2. 5 C.F.R. 713.214(a)(1), now codified at 29 C.F.R. 1613.214(a)(1), permits the agency to accept discrimination complaints only where it is able to determine that, "(i) The complainant brought to the attention of the Equal Employment Opportunity Counselor the matter causing him to believe he had been discriminated against within 30 calendar days...."

3. 42 U.S.C. § 2000e–16(c) provides that a lawsuit may be filed in U. S. District Court within 30 days after an aggrieved employee's receipt of notice of the final decision. Administrative exhaustion and timeliness are jurisdictional prerequisites to plaintiffs' lawsuit. *Brown v. GSA*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *Hoffman v. Boeing*, 596 F.2d 683 (5th Cir. 1979), and *Carter v. Lynn*, 401 F.Supp. 1383 (D.D.C.1975).

five percent and ultimately was dropped from the rating process.[4]

9. Under this system, the plaintiffs have both received numerical ratings that place them within the "Highly Qualified" category. Hazel Woodard has received scores as high as ninety-eight out of a possible one hundred, and Robert Mills has received a rating of eighty-eight out of a possible one hundred.

### Robert T. Mills

10. Robert Mills has been employed at SOUTHDIV since 1955. He was promoted to the GS–4 level in 1963 as a Supply Clerk, but did not advance beyond that level until 1981. He had applied for promotion on four occasions before he submitted the present complaint. In 1963 he applied for a GS–5 Property Inventory Clerk position in the Real Estate Division at SOUTHDIV; and in 1964, he applied for the same position again. In 1967, he applied for a GS–5 Plan File Clerk position. And in 1974, he applied for the position of File Clerk, GS–5, in the SOUTHDIV Acquisition Department. He was rejected on the 1963, 1964 and 1967 applications and filed an unsuccessful discrimination complaint.[5] The 1974 position was abolished and was not filled by anyone.

11. Robert Mills has worked in the Procurement, Services, and Supply Branch at SOUTHDIV during the time period relevant to his complaint. That branch has gradually been reduced in size over the past twelve years. In 1969, there were five employees in the branch. During a 1970 reduction in force, that number was reduced to four. In 1974, one GS–5 clerk left, and her position was abolished. In 1981, one employee retired and another was promoted out of the branch. At that time, Mills was given additional duties and was promoted to a GS–5. Only one of the two remaining positions was filled.

12. Robert Mills has received supervisory appraisals that range from excellent to outstanding. And he has received cash awards for sustained superior performance. But he has not shown a recent interest in jobs outside of the shrinking Procurement, Services, and Supply Branch at SOUTHDIV. Other black employees have been encouraged along with Mills to apply for upward mobility jobs that lead to greater potential for advancement. In one instance, he states that he was offered a trainee position as a Construction Representative, but declined. Another SOUTHDIV black was given the job and has advanced to the GS–8 level. One of Mills' former subordinates, Sol Ortner (a white male), was able to advance from a GS–3 to the GS–5 level in another upward mobility position.

13. Both Robert Mills and one of his supervisors, Edward Schwacke, believed that he was capable of performing at the GS–5 level without additional training. According to Schwacke, Mills' only problem was that there were no vacant positions in the Supply Branch.

14. Based on findings five through nine and ten through thirteen, the court finds that the plaintiff, Robert T. Mills, was not adversely affected by training and promotion practices at SOUTHDIV. And further, the court finds that Mills was not promoted because there were no vacancies available at the time he filed his administrative complaint or during the relevant time period of his lawsuit.

### Hazel D. Woodard

15. Hazel Woodard has been employed at SOUTHDIV since 1964. She began as a Clerk-Typist, GS–3, and was promoted to Accounts Maintenance Clerk (Typing), GS–4, in 1965. Subsequently, her job title was changed to Accounting Technician, but

---

4. A numerical score is no longer assigned to the supervisory appraisal. However, the personnelist responsible for rating an applicant may look at the supervisory appraisal and compare it with the SF–171.

5. The previous discrimination complaint has not been offered in evidence by plaintiff to permit the court to determine whether there is an issue of *res judicata* or collateral estoppel preventing relitigation. The defendant routinely purges its files after two years.

Woodard's duties in the Accounting Section at SOUTHDIV did not change. She has not been able to advance beyond the GS–4 level and believes that work assignments from her supervisor, Elizabeth Lilienthal, have adversely affected her opportunities for advancement in that the assignments involve obsolete functions and the use of outdated equipment.

16. Hazel Woodard submitted an application for promotion to the position of Supervisory Accounts Maintenance Clerk, GS–6, on July 30, 1973. She applied under an open continuous announcement and her application was effective for a period of one year. She received a "qualified" rating from the CCPO. However, there were no promotions to the GS–6 level in the Accounting Section during the time period covered by her application.

17. Another application was filed by the plaintiff for accounting positions at the GS–5 level on an open continuous announcement in 1974. She was placed on the register for Accounting Technician, GS–5, and Voucher Examiner, GS–5, on July 23, 1974. She received a "Highly Qualified" rating and a numerical score of eighty-eight. During the time period that this application was effective, there were two vacancies in the SOUTHDIV Acquisition Division. The positions were filled by a reassignment or transfer[6] of Kate Holland and Delores Butcher in 1975.

18. The plaintiff did not renew her application for promotion to Accounting Technician, GS–5, until after she had submitted her administrative complaint of discrimination.

19. While the administrative complaint and the present lawsuit were pending, the plaintiff's application for promotion to Accounting Technician, GS–5, was renewed on four occasions: May 25, 1976; March 12, 1977; June 1, 1979; and June 23, 1981. Hazel Woodard has not been selected for promotion during the time period covered by her applications for promotion at

SOUTHDIV or any other Navy activity served by the CCPO.

20. During the time period covered by Hazel Woodard's complaint, there have been a number of other employees who have not been promoted. They include: Dale Ciuffo Smith, a GS–5 since 1971; Linda Tanner, a GS–5 since 1972; Rita Delicati, a GS–4 employed in 1974; and Jeanette Tizdale, a GS–5 since 1974. They are members of the white race.

21. During the time period covered by Hazel Woodard's complaint, there have been two employees promoted to the GS–5 level or higher. Grace McMillan was promoted from GS–4 to GS–5 in 1972 and to GS–6 in 1977. Beverly Cummings was promoted from GS–4 to GS–5 in 1976 and to GS–6 in 1977. They are members of the white race.

22. Elizabeth Lilienthal is the plaintiff's supervisor. In Lilienthal's absence, Ruth Baker serves as plaintiff's supervisor. Both state that Hazel Woodard wastes time by asking redundant questions about her work assignments and in some instances requires an excessive amount of time to complete assignments because of her inability to handle complicated accounting work. They have little extra time to attempt on-the-job training that might improve her performance, but they have recommended that the plaintiff complete a college level accounting course at government expense.

23. On three occasions Hazel Woodard has enrolled in accounting courses taught by local colleges. In the first two courses, the plaintiff dropped out after two to three weeks. In the most recent course, she continued beyond the deadline for dropping out and received a failing grade.

24. Elizabeth Lilienthal and Ruth Baker examined a list prepared by the plaintiff that allegedly identifies other SOUTHDIV employees who have received preferential treatment in promotions to the GS–5 or GS–6 level as Accounting Technicians. In

---

**6.** A reassignment or lateral transfer of an employee already serving at the same grade level announced on the register is not treated as a promotion and does not require competition with other applicants.

each instance depicted in the plaintiff's exhibits, both Lilienthal and Baker considered the employee promoted by SOUTHDIV to be better qualified than the plaintiff because of superior performance of their duties.

25. Hazel Woodard was interviewed for promotion to a GS–5 position at the Naval Supply Center, Charleston, South Carolina, on July 7, 1981. That activity is served by the same CCPO, but otherwise operates independently of SOUTHDIV. As of March 31, 1978, the Naval Supply Center had 875 civilian employees. Two hundred seventy-four of these employees, or 31.3%, were black. It is cited by the plaintiffs as an excellent example of the way in which an EEO program in a government agency should operate. It has the highest percentage of black employees of any Navy activity of a comparable size in the Charleston area. The Naval Supply Center uses a very rigid and formal procedure to select applicants for promotion. Members of a selection panel ask each applicant a set of written questions related to the job being filled. Each panel member rates the applicants without any discussion of their qualifications among the panel members. An EEO representative serves on the panel. The ratings are averaged and the applicant with the highest score is selected. In the plaintiff's case, the panel was chaired by David Gimbrill and included a black as the EEO representative. The plaintiff received the lowest rating of five applicants using this procedure. All members of the panel gave the plaintiff the lowest score. Both Gimbrill and the black panel member agreed on the low rating assigned to Woodard and agreed on the selection of the highest scoring applicant.

26. David Gimbrill stated that the plaintiff was given a low rating because of her inability to give specific information in response to questions about the publications or documents she had used.

27. Based on findings fifteen through twenty-five above, the court finds that Hazel D. Woodard was not adversely affected by promotion practices at SOUTHDIV on the basis of her race. Further, the court finds that Hazel D. Woodard was not treated differently because of her race with regard to training that might lead to promotion, and that she was not promoted because of problems in the performance of her GS–4 level duties.

## CONCLUSIONS OF LAW

1. This court has jurisdiction to hear plaintiffs' complaints of racial discrimination in their employment pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq. See, Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976).

2. Generally, there are two types of Title VII cases. The first category deals with claims of "disparate treatment" of individual employees and the second with "disparate impact" on classes of people. *See, Teamsters v. United States*, 431 U.S. 324, 335, n. 15, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977). In either type of Title VII litigation, the plaintiff must carry the initial burden of establishing a prima facie case. *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977); *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

3. Disparate treatment involves "employment practices that are facially neutral in their treatment of different groups but that in fact fall more heavily on one group than another and cannot be justified by business necessity." *Teamsters v. United States*, 431 U.S. at 336, 97 S.Ct. at 1854 n. 15. *See also, Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Uniform Guidelines on Employee Selection Procedures (1978)*, 29 C.F.R. § 1607 (1981). To prove a prima facie claim under the disparate impact theory, a plaintiff must show that a challenged personnel practice or procedure has an adverse impact on members of his class. *Dothard v. Rawlinson*, 433 U.S. at 329, 97 S.Ct. at 2726. The *Uniform Guidelines* adopt the "⅘ths" or "80 percent" rule to measure adverse impact. Where selection rates for a minority are less than "⅘ths" or "80 percent" of the rates achieved by the highest scoring group on any given test or selection crite-

ria,[7] it is said to have an adverse impact and must be validated under the *Uniform Guidelines.* Any selection criteria that has an adverse impact must be validated under the *Uniform Guidelines.* Any selection criteria that does not have an adverse impact does not violate Title VII or the *Uniform Guidelines* and does not require validation.

4. Employment statistics may be used to prove either a disparate treatment or a disparate impact claim. *See, Hazelwood School District v. United States,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977); *Davis v. Califano,* 613 F.2d 957 (D.C.Cir.1979).

■ 5. The probative value of employment statistics varies with the size of the statistical universe or sampling used by the plaintiff. In *Officers for Justice v. Civil Service Commission,* 371 F.Supp. 1328 (D.Cal.1973), the court held that the plaintiff had not made out a statistical claim where an employment test had been taken by 201 candidates, eleven of whom were minorities. And in *Dendy v. Washington Hospital Center,* 431 F.Supp. 873 (D.D.C. 1977), there were nine blacks among thirty-five applicants taking an examination. All whites passed and only four blacks passed. In rejecting the plaintiffs' claim, the *Dendy* court noted:

> If, on the one hand, the courts were to ignore broadly based statistical data, that would be manifestly unfair to Title VII complainants. But if, on the other hand, the courts were to rely heavily on statistics drawn from narrow samples, that would inevitably upset legitimate employment practices for reasons of appearance rather than substance. The court must be astute and safeguard both of these conflicting interests.
>
> ... With so meager a sample, if just a handful of test results had turned out

differently, the comparative percentages of black ... and white ... success on the exam would have been correspondingly, and substantially, different. In the Court's estimation, "Such small numbers are insufficient to support any conclusion as to whether the rule has a discriminatory effect." (citations omitted).

*Id.* at 876. *See also, Harper v. Trans World Airlines, Inc.,* 525 F.2d 409 (8th Cir. 1975). An excellent explanation of the statistics required to prove a discrimination claim is provided in *Garrett v. R. J. Reynolds Industries, Inc.,* 81 F.R.D. 25 (D.N.C.1979). The plaintiff must demonstrate that a particular racial composition could not have occurred by chance. This is demonstrated only where the difference between the expected black representation and the actual result exceeds two or three standard deviations. *See, Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768.

■ 6. Where demographic statistics[8] are used by the plaintiff, they must compare relevant segments of the employer's work force with appropriate occupational categories in the area where the employer recruits. *See, EEOC v. United Virginia Bank,* 615 F.2d 147 (4th Cir. 1980).

■ 7. Where a plaintiff has made a prima facie showing of discrimination, the employer must articulate its reasons for the plaintiff's rejection. In *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), this requirement was explained as follows:

> The defendant need not persuade the court that it was actually motivated by the proffered reasons .... It is sufficient if the defendant's evidence raised a genuine issue of fact as to whether it discriminated against the plaintiff .... The plaintiff retains the burden of per-

---

7. *E.G.,* An employer makes its selections for promotion on the basis of applicant's scores on a written test. If thirty percent of all white applicants and thirty percent of all black applicants pass the test, the selection rates are equal and there is no adverse impact. However, if only twenty percent of the black applicants pass the test, their selection rate would be less than eighty percent of the selection rate for

whites ($^{20}/_{30}$ = .666 × 100 = 66⅔%). The test would then have an adverse impact and validation would be required.

8. Demographic statistics compare a "snapshot" depicting the racial composition of the employer's work force with relevant segments of the local census.

suasion. She must now have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision.

*Id.* at 1094.

### The Disparate Impact Claims

■ 8. Robert T. Mills has failed to show that any specific personnel practice or policy has resulted in the rejection of an application for promotion. The defendant did not use written tests or any other selection criterion that prevented his promotion. While he claims that subjective supervisory appraisals adversely affected his opportunities for promotion, the record clearly demonstrates that he was treated favorably in this regard. He received laudatory comments from his SOUTHDIV supervisors and even received cash awards for superior performance on the basis of their appraisals. This treatment does not support a claim of disparate impact.

9. Hazel D. Woodard has failed to show that any specific personnel practice or policy has resulted in the rejection of an application for promotion. The defendant did not use written tests or any other selection criterion that prevented her promotion. While she claims that subjective supervisory appraisals adversely affected her applications, the record demonstrates that her supervisor marked Woodard "not observed" and that this was not reflected in her rating. In each instance, she received scores ranging from eighty-eight to ninety-eight out of a possible one hundred and was considered "Highly Qualified." This treatment does not support a claim of disparate impact.

### Employment Statistics

10. The plaintiffs offered exhibits that compare the general racial composition of the SOUTHDIV work force with the general population in the Charleston area. They make only a token effort, however, to compare specific job categories in the SOUTHDIV work force with the qualified labor market.

11. The SOUTHDIV work force is primarily devoted to engineering disciplines on which few blacks are available to fill vacancies. The correct approach would have been to compare the percentage of blacks employed in such disciplines at SOUTHDIV with the percentage of similarly qualified blacks in the area from which SOUTHDIV can reasonably be expected to recruit. *See, EEOC v. United Virginia Bank*, 615 F.2d 147 (4th Cir. 1980); *Garrett v. R. J. Reynolds Industries, Inc.*, 81 F.R.D. 25 (D.N.C. 1979).

12. The plaintiffs' only comparison of specific job categories in the SOUTHDIV work force with the relevant population in the Charleston area dealt with five job categories in the "clerical and related" field. The job categories depicted in this comparison are in the 301, 305, 312, 318 and 322 series. However, the plaintiffs' jobs are in different series with no apparent relationship to those in their exhibit. Robert Mills' job as a Supply Clerk is in the GS–2005 series, and Hazel Woodard's position as an Accounting Technician is in the GS–525 series.

■ 13. While the low percentage of blacks in some "clerical and related" job categories is a factor that may be considered by the court, plaintiffs' statistics are incomplete and inconclusive. Standing alone, they cannot support a finding of employment discrimination.

### The Disparate Treatment Claim

■ 14. The defendant had no vacancies and did not seek applicants for positions desired by Robert Mills in recent years. Mills admits that he was offered training in another field with excellent potential for advancement, but he declined the offer. Another black was selected and was subsequently promoted to the GS–8 level. On the basis of these facts, Robert Mills has not made a prima facie showing of discrimination. *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

15. The defendant sought applicants for positions desired by Hazel Woodard under various open continuous announcements. At the time Woodard complained about dis-

crimination at SOUTHDIV in 1976, however, the only positions filled were reassignments or lateral transfers from other Navy activities. The defendant did not "promote" any of the applicants. On the basis of these facts, Hazel Woodard has not made a prima facie showing of discrimination. *Id.* at 792, 93 S.Ct. 1817, 36 L.Ed.2d 668.

16. Assuming arguendo that Hazel Woodard has made out a prima facie claim with regard to subsequent vacancies at SOUTHDIV, the defendant has articulated a legitimate, nondiscriminatory reason for her rejection. Woodard's supervisors explained their problems in getting the plaintiff to perform routine duties in her GS–4 level job. They state that she requires an excessive amount of time to complete her work assignments. They have attempted to provide training to improve Woodard's prospects for promotion; but the plaintiff has been a slow learner, and a demanding workload eventually took priority over training plans for both blacks and whites in their division. On the basis of their observations, Woodard would not be suitable for promotion. Other officials responsible for promotions at government activities not connected with SOUTHDIV have rejected plaintiff on the basis of her inability to answer basic questions about government accounting. Plaintiff has attempted to complete accounting courses at independent technical schools or colleges on three separate occasions, but either dropped out or received a failing grade. The evidence offered by the defendant to support its reasons for plaintiff's rejection is adequate to raise a genuine issue of material fact. *See, Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

17. Hazel Woodard has not been able to demonstrate that reasons articulated by the defendant for her rejection are pretextual. *See, id.* The evidence she has offered, including relevant employment statistics, simply fails to show that reasons articulated for her rejection are untrue.

## CONCLUSION

18. A careful review of the record, including employment statistics, provides no justifiable basis for a finding in favor of either plaintiff. The evidence clearly establishes that SOUTHDIV did not fill any vacancies by promotions or outside hires at the time their complaint was submitted. Further, in subsequent promotions sought by plaintiff Woodard, selections were made on the basis of individual ability to perform rather than on the basis of her race. In plaintiff Mills' case, he was promoted as soon as a position in his section became vacant. It is, therefore,

ORDERED, that the relief prayed for in plaintiffs' complaint be, and the same is hereby, denied, and this case is hereby dismissed. It is

ORDERED FURTHER, that each party is to pay his own costs of this action.

AND IT IS SO ORDERED.